UNITED STATES, Appellee

v

HERMAN M. THOMPSON, Private, U. S. Army, Appellant

22 USCMA 88, 46 CMR 88

No. 25,603

December 29, 1972

*Captain Mark L. Tuft* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Colonel Joseph E. Donahue, Captain Francis X. Gindhart,* and *Captain Gordon W. Hatheway, Jr.*

*Captain James F. Motley* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Captain Richard L. Menson, Captain Stan L. Spangler,* and *Captain Benjamin P. Fishburne, III.*

DARDEN, Chief Judge:

One of several charges against this accused was uttering provoking words and making provoking gestures to a stockade guard. The words were " 'Don't yell at me or I'll wring your —— neck.' " The gestures were that the accused jumped out of bed and cocked his arm as if he were going to swing at the guard.

Our grant of review considers whether the evidence was sufficient in law to establish that these words and gestures tended to induce a breach of the peace. A relation of the facts follows.

Specialist Four Sawin, a stockade guard, awoke the prisoners and told them to prepare their bunks in a special way. When he returned in 15 minutes, the accused was still in bed. Sawin warned him again. Later, when Sawin called the cell block to attention for inspection by a physician, the accused was still in bed. Sawin again told the accused to get up, after which the accused responded with the words and gestures described above.

At the time the accused uttered these words and made the gestures he was confined in a cell having its bars and door covered with perforated steel mesh. Unless Specialist Sawin opened the cell he could not have struck the accused, nor could the accused have reached him. Specialist Sawin testified that as a result of special training in correctional custody he had been taught to expect encounters such as this and how to handle them. He added that he had frequently received verbal abuse from other prisoners.

The accused calls our attention to the history of the offense of provoking speech and gestures. As set forth in United States v Carter, 3 CMR (Air Force) 801 (BR 1950), the offense is traceable to the Ordinance of Richard I, A. D. 1190, which was issued to prevent disputes between soldiers and sailors on their way to the Holy Land in the Third Crusade. It first appeared in American military law in Article 11 of the Code of 1775 as a part of the prohibition against dueling. The two offenses were separated in The Continental Articles and Rules for the Better Government of the Troops, adopted September 20, 1776, 1 Jour Cong 4, 82 (1776), and the provoking words and gestures offense has remained substantially the same since that time. United States v Carter, supra; Brown, *Must the Soldier be a Silent Member of our Society?*, 43 Mil L Rev 71, 73, 87, nn 11, 83 (1969).

■ The main objective of the prohibition, according to Winthrop, has been "to check such manifestations of a hostile temper as, by inducing retaliation, might lead to duels or other disorders." Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 590. "This Article [117] is designed to prevent the use of violence by the person to whom such speeches and gestures are directed, and to forestall the commission of an offense by an otherwise innocent party." United States v Holiday, 4 USCMA 454, 458, 16 CMR 28, 32 (1954). Our task is to determine within what limits the triers of fact are confined in deciding that particular words or gestures tend to induce breaches of the peace. United States v Carter, supra, sets those limits as including those words and gestures of a kind likely to induce a breach of the peace.

■ The accused argues that the tendency of words and gestures to induce a breach of the peace must be shown to exist in fact under the particular circumstances of each case. He contends that the test may not be applied to the use of words in isolation without considering the circumstances. He also urges we adopt as a test that the natural and probable consequences of the words or actions are to incite a breach of the peace. Incitement of the victim to immediate action is the evil to be prevented and the crucial inquiry into the sufficiency of the evidence is the extent to which the words or gestures tend to do this.

Chaplinsky v New Hampshire, 315 US 568, 86 L Ed 1031, 62 S Ct 766 (1942), explains the kind of unprotected speech with which we are concerned:

".  .  . These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." 315 US at 572 (footnotes omitted).

In Chaplinsky, the Supreme Court affirmed a conviction of the defendant for calling a city marshal a " 'God damned racketeer' " and " 'a damned Fascist.' "

Examining Thompson's words, we find that they hardly qualify as "fighting words." The words were not libelous and we have difficulty in agreeing that they were insulting. They were more in the nature of a challenge or threat or perhaps a combination of the two. The inelegant participle omitted from the text of this opinion added nothing to the personal offensiveness of the utterance. Rather, it more likely was a manifestation of a limited vocabulary. In some circumstances and to a different audience these same words and gestures might reasonably tend to precipitate a violent reaction. But, regardless of the test applied, we cannot agree that in the circumstances of this case they either tended to or were likely to provoke a reasonable guard who was outside the cell into entering and responding with violent actions or words. Nor can it be said that violence was the natural and probable consequence of their use.

In United States v Shropshire, 20 USCMA 374, 43 CMR 214 (1971), we considered the effect of similar circumstances in regard to the analogous

charge of communicating a threat. In that case, an accused under restraint uttered the words charged but conditioned his threat upon removal of the restraining gear. In finding that the evidence was insufficient in law to support the offense, we pointed out that "no reasonable guard would have removed the restraining gear in order to permit an attack on himself." Id at 375, 43 CMR at 215.

■ In the present case, we similarly concern ourselves with threatening language and gestures employed by an accused so confined in a barred and screened cell that violence could not result unless Specialist Sawin, a trained custodian, saw fit to open the door and retaliate. As we noted in Shropshire, no reasonable guard under the circumstances was likely to do so and Sawin in fact stated there was no intention on his part to take action. The circumstances of the accused's confinement, the words used, and Sawin's attitude all dictate the conclusion that there was no reasonable tendency that the accused's words would provoke a breach of the peace. Accordingly, we find the evidence insufficient to support the findings of guilty.

As we stated in United States v Shropshire, supra, we have no desire to leave any impression that a person under restraint may threaten his custodian with impunity. While we cannot find in the circumstances of this case that the accused's words constituted a violation of Article 117, Uniform Code of Military Justice, 10 USC § 917, other options are open for the prosecution of those who threaten guards or are disrespectful to them. We simply cannot affirm this conviction on the basis that the accused has somehow committed punishable conduct in the speech area. Compare United States v Johnson, 21 USCMA 279, 45 CMR 53 (1972).

The findings of guilty of Additional Charge II and its specification must be set aside, but we find no prejudice as to the sentence. The accused pleaded guilty to two specifications of disrespect to a superior officer, one of will-

ful disobedience of a superior officer, and one of assault. As the accused was tried by special court-martial for his offenses, the maximum sentence extended to a bad-conduct discharge and forfeitures and confinement for 6 months. The maximum is not changed at all by our action in this case and the accused was sentenced to no more than a bad-conduct discharge and confinement and forfeitures for 1 month. In light of the nature of the other offenses, the accused's prior record, and the sentence adjudged, we are highly confident the findings of guilty of Additional Charge II and its specification played no appreciable role in the adjudication of the accused's punishment. Accordingly, we see no reason for reassessment of the sentence. United States v Shropshire, supra.

The findings of guilty of Additional Charge II and its specification are set aside and Additional Charge II is ordered dismissed. As thus modified, the decision of the Court of Military Review is affirmed.

Judges QUINN and DUNCAN concur.